IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Anndernia C.,[1]                    )       C/A No.: 1:20-cv-1702-SVH
                                    )
            Plaintiff,              )
                                    )
    vs.                             )
                                    )               ORDER
Andrew M. Saul,                     )
Commissioner of Social Security     )
Administration,                     )
                                    )
            Defendant.              )
                                    )
_____     )

This appeal from a denial of social security benefits is before the court
for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B)
(D.S.C.), and the order of the Honorable Richard M. Gergel, United States
District Judge, dated June 23, 2020, referring this matter for disposition.
[ECF No. 8]. The parties consented to the undersigned United States
Magistrate Judge's disposition of this case, with any appeal directly to the
Fourth Circuit Court of Appeals. [ECF No. 7].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social
Security Act ("the Act") to obtain judicial review of the final decision of the
Commissioner of Social Security ("Commissioner") denying the claim for
disability insurance benefits ("DIB") and Supplemental Security Income

---

[1] The Committee on Court Administration and Case Management of the
Judicial Conference of the United States has recommended that, due to
significant privacy concerns in social security cases, federal courts should
refer to claimants only by their first names and last initials.

("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On September 27, 2016, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on November 15, 2012. Tr. at 81, 83, 185–91, 192–98. Her applications were denied initially and upon reconsideration. Tr. at 118–22, 128–31, 132–35. On January 23, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Flora Lester Vinson. Tr. at 1788–1817 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 14, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–25. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 30, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 52 years old at the time of the hearing. Tr. at 1793. She completed high school. Tr. at 53. Her past relevant work ("PRW") was as a graphic designer. Tr. at 1800. She alleges she has been unable to work since September 27, 2016.[2] Tr. at 297.

2.    Medical History[3]

On April 8, 2013, Plaintiff presented to A. Nicholas DePace, Ph.D. ("Dr. DePace"), for a consultative mental status exam ("MSE"). Tr. at 309–12. She alleged depression, anxiety, and memory problems. Tr. at 309. She reported not wanting to talk to people or engage in activities. Tr. at 310. She indicated her activities primarily including sleeping and searching for jobs on the internet. *Id.* She denied cooking, performing household chores, and driving. *Id.* She stated she was unmotivated to engage in personal hygiene. *Id.* Dr. DePace noted Plaintiff was appropriately dressed and groomed, somewhat evasive in her responses, alert, had normal psychomotor behaviors, spoke slowly and softly, and had a somewhat constricted affect. Tr. at 310–11. Plaintiff endorsed auditory and visual hallucinations and poor frustration

---

[2] In a pre-hearing brief, Plaintiff's counsel amended her alleged onset date to coincide with her fiftieth birthday. Tr. at 297.

[3] The parties have limited their discussion to evidence pertaining to Plaintiff's mental impairments. The court has accordingly declined to summarize evidence as to Plaintiff's physical impairments.

tolerance. Tr. at 311. Dr. DePace observed Plaintiff to have goal-directed and coherent thought processes and to be cooperative and functioning in the average intellectual range. *Id.* However, he suspected Plaintiff was not putting forth appropriate effort to portray herself as more impaired. *Id.* He stated Plaintiff was able to follow directions. *Id.* His diagnostic impressions were: (1) rule out exaggeration of emotional symptoms; and (2) consider depressive disorder, not otherwise specified ("NOS"). *Id.* He considered Plaintiff to be capable of performing three-step commands. *Id.*

Plaintiff was hospitalized at McLeod Behavioral Health from July 25 through July 31, 2015, for major depressive disorder ("MDD"), recurrent and severe. Tr. at 324. She presented to the hospital with increased depression, hypersomnia, tearfulness, suicidal ideation, and occasional homicidal ideation toward her sister. *Id.* She endorsed increased depression related to multiple, poorly-controlled medical problems and familial situations. *Id.* During her hospitalization, Effexor was continued and titrated up and Abilify was added to her medication regimen. *Id.* Plaintiff also had significant hyperglycemia on admission, and Cathy Layne, M.D. ("Dr. Layne"), considered it to be affecting her mood, energy, and hypersomnia. *Id.* Plaintiff's mood, energy, and sleep improved, and she was discharged to

follow up on an outpatient basis. *Id.* She had a global assessment of functioning ("GAF")[4] score between 55 and 60[5] at the time of discharge. *Id.*

Plaintiff presented to nurse practitioner Cindy Lawrimore ("NP Lawrimore"), at Hope Health on August 11, 2015. Tr. at 1245. She continued to report thoughts of harming family members, stating she would "like to strangle her sister." Tr. at 1246. She also endorsed intermittent thoughts of shooting people and burning down buildings. *Id.* Plaintiff was accompanied by her husband, who reported there were no guns, knives, or products to start a fire in their home. *Id.* Plaintiff's husband indicated that a family member remained with her at all times and that her family feared she might harm them. *Id.* Plaintiff endorsed uncontrolled anger. *Id.* NP Lawrimore observed Plaintiff to have poor eye contact and to smile when she spoke of harming others. *Id.* Plaintiff denied visual and auditory hallucinations and had no specific plan for harm. Tr. at 1247. NP Lawrimore noted Plaintiff had appropriate mood and affect, poor judgment and insight, and was oriented to

---

[4] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[5] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

time, place, person, and situation. Tr. at 1248. She prescribed Abilify 20 mg and Effexor XR 150 mg. *Id.*

Plaintiff presented to Rosanne Fulcher, LPC ("Counselor Fulcher"), at WellSpring Psychology Group, LLC, for psychotherapy intake on August 12, 2015. Tr. 1370–72. She stated she wanted to kill herself to "end [her] suffering" and hurt her sister "for destroying [her] marriage." Tr. at 1370. She reported being easily agitated and distrusting, expecting the worst, and having negative ruminative thinking, poor self-esteem, high anxiety around others, and little to no support. *Id.* She indicated she had been married to her husband for seven years, but separated for five because her sister convinced her husband that she had been unfaithful when she had not. *Id.* Counselor Fulcher noted poor insight and judgment, blunted affect, dysphoric and angry mood, initially guarded behavior, and otherwise normal findings on MSE. *Id.* She indicated a diagnosis of MDD, recurrent and severe. Tr. at 1372.

Plaintiff followed up with Counselor Fulcher on August 17, 2015. Tr. at 1373. Counselor Fulcher indicated Plaintiff's treatment goals were to report feeling less agitated, angry, and depressed. *Id.* She planned to use cognitive behavioral techniques, anger management, exploration of coping and relationship patterns, structured problem solving, supportive reflection, interactive feedback, the severity measure for anger and depression in the *Diagnostic and Statistical Manual*, Fifth Edition ("*DSM-5*"), and to encourage

exercise, relaxation, and deep breathing. *Id.* She also noted that Plaintiff would be treating with a psychiatrist. *Id.* She recommended weekly counseling sessions. Tr. at 1374. Counselor Fulcher noted Plaintiff's scores on the severity measures for anger and depression fell in the severe ranges. Tr. at 1375. She described Plaintiff as oriented/alert with dysphoric mood, appropriate affect, and interactive interpersonal skills. *Id.* She stated Plaintiff's functional status was variably impaired. *Id.* Plaintiff reported isolating in bed, dwelling on angry thoughts, not eating, and experiencing low energy and motivation and no interest in anything. *Id.* She indicated that she had tried to calmly inform her husband of his actions that angered her, and Counselor Fulcher commended her for practicing the exercise. *Id.* She encouraged Plaintiff to use stress management techniques of exercise and relaxation. *Id.* Plaintiff stated that she felt as if everyone with whom she had been close had died or abandoned her. *Id.* Counselor Fulcher encouraged Plaintiff to write a letter expressing her feelings to her deceased mother, to exercise up to 30 minutes a day and take walks when she felt angry, and to continue to work on building a civil relationship with her husband. Tr. at 1376.

Plaintiff presented to Nikunjkumar Modi, M.D. ("Dr. Modi"), for an initial psychiatric visit on August 27, 2015. Tr. at 1242. She reported difficulty functioning and depressed mood. *Id.* She indicated she was no

longer able to cook, could not be in crowded areas, and had to leave church. *Id.* She stated her husband had hid all the guns and knives that had been in the house. *Id.* She endorsed suicidal ideation with a plan to either shoot herself, cut her wrist, or overdose on medication. *Id.* She also expressed homicidal ideation toward her sister. *Id.* Dr. Modi arranged for Plaintiff to be transported to McLeod Regional Medical Center. *Id.*

Rosen J. Lawsen, M.D. ("Dr. Lawsen"), consulted on Plaintiff's case on August 27, 2015, after Dr. Modi placed her on commitment papers for suicidal ideation with a plan. Tr. at 957–59. During the consultation, Plaintiff denied having reported to Dr. Modi that she was suicidal and wanted to hurt her sister. Tr. at 957. Plaintiff indicated her sister, Louise,[6] had informed her that her husband was cheating on her, which her husband had denied. Tr. at 958. She subsequently admitted to thoughts of hurting her sister, but stated she would never carry out those thoughts. *Id.* Dr. Lawsen indicated Plaintiff was somewhat depressed and anxious, but did not show pressured speech, loose associations, circumstantiality, or tangentiality. *Id.* She noted Plaintiff had insight into her problems and planned to take her medication as prescribed as soon as it was delivered to her. *Id.* Dr. Lawsen assessed MDD, current and severe, and a GAF score of 50.[7] *Id.* She discharged Plaintiff to the

---

[6] Plaintiff reported having three sisters and five brothers. Tr. at 958.

[7] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment

care of her husband, and Plaintiff agreed to stay away from Louise. Tr. at 957, 958.

Plaintiff followed up with NP Lawrimore on September 4, 2015. Tr. at 1239. She endorsed irritability, depressed mood, difficulty falling asleep, diminished interest or pleasure, fatigue, and loss of appetite. *Id.* She indicated she had obtained a pet to "keep her calm" and was "trying to stay in her home and keep to self." *Id.* She denied having received her Abilify prescription. *Id.* NP Lawrimore noted Plaintiff had depressed mood with poor eye contact and intermittent grinning and smiling that did not relate to the conversation at hand. Tr. at 1240.

Plaintiff followed up with Counselor Fulcher on the same day. Tr. at 1379. Counselor Fulcher described Plaintiff as alert and oriented, a little anxious, having appropriate affect and interactive interpersonal skills, and variably impaired as to functional status. *Id.* Plaintiff reported feeling calmer on the increased dose of medication. *Id.*

On September 8, 2015, Dr. Modi noted Plaintiff to be calm and cooperative; have good eye contact; smile appropriately; and demonstrate a logical, linear, and goal-directed thought process. Tr. at 1236. Plaintiff denied suicidal and homicidal ideations, hallucinations, and paranoia. *Id.* Dr. Modi

---

in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR.*

noted fair insight and judgment. *Id.* He assessed anger and unspecified depressive psychosis. *Id.*

Plaintiff's anger and depression scores fell in the severe range again on September 11, 2015. Tr. at 1381. She indicated she had been staying in her house to avoid further altercations with her sister. *Id.* She reported medication changes had made her feel calmer and more in control. *Id.*

On September 25, 2015, Plaintiff's anger and depression scores fell in the severe range. Tr. at 1383. She endorsed further anger issues and a recent altercation with her sister, who lived next door to her. *Id.* She admitted she had been drinking prior to the altercation. *Id.* Counselor Fulcher encouraged Plaintiff to avoid alcohol and to move to another location to get away from her sister. *Id.* Plaintiff reported she had been walking her dog daily to reduce her agitation. *Id.*

On October 2, 2015, Plaintiff endorsed obsessive thoughts and compulsions, such as changing bed linens twice a week even if the bed had not been slept in. Tr. at 1385. She reported avoiding conflict with her sister, but being angry with her husband for leaving dishes in the sink and urinating on the bathroom floor. *Id.* She stated she had informed her husband that she would leave if he did not alter his behavior over the next two weeks. *Id.* Counselor Fulcher noted diagnoses of MDD and obsessive-compulsive disorder ("OCD"). *Id.*

Plaintiff followed up with Dr. Modi for medication management on October 6, 2015. Tr. at 1364. She reported having an altercation with her sister, Louise, on her birthday, but indicated she walked away to diffuse the situation. *Id.* She indicated therapy sessions were going well, and her therapist had helped her to develop coping skills that helped her address conflicts with her husband as to household chores. *Id.* Dr. Modi noted Plaintiff was calm, cooperative, well-dressed, had fair insight and judgment, and denied hallucinations, suicidal and homicidal ideation, and paranoia. Tr. at 1366.

On October 16, 2015, Plaintiff's DSM-5 anger and depression measure scores had fallen into the moderate range. Tr. at 1389. Counselor Fulcher noted normal findings on exam, except that Plaintiff's mood was a little dysphoric. *Id.* Plaintiff reported using coping techniques to deal with her sister and distraction techniques to avoid changing the bed linens. *Id.*

Plaintiff continued to endorse moderate levels of anger and depression on October 23, 2015. Tr. at 1391. Counselor Fulcher noted Plaintiff's mood was irritable and her functional status was variably impaired. *Id.* Plaintiff reported having lost her temper with her husband because she was not feeling well. *Id.* She complained that her husband belittled her in front of his friends and that his entertaining friends interrupted her sleep. *Id.* She

reported that her daughter was planning to pick her up and move her to Georgia in two weeks. *Id.*

Plaintiff had moderate levels of anger and depression on November 6, 2015. Tr. at 1393. Counselor Fulcher noted Plaintiff's mood was dysphoric, but indicated otherwise normal findings on MSE. *Id.*

On November 13, 2015, Plaintiff demonstrated dysphoric mood and blunted affect. Tr. at 1395. She reported she had recently been ill, and her doctor had discouraged her from moving to Georgia until her medical condition stabilized. *Id.* She was disappointed in not being able to move away from her husband and sister and expressed thoughts of wanting to hurt her husband. *Id.* Counselor Fulcher encouraged Plaintiff to consider moving in with her son, who had informed her that he had a room available for her. *Id.*

Plaintiff was hospitalized at McLeod Regional Medical Center from November 14 to November 20, 2015, for uncontrolled diabetes with hyperglycemic coma. Tr. at 479. She reported bipolar disease affected her medical compliance. *Id.*

Plaintiff followed up with NP Lawrimore on November 25, 2015. Tr. at 1349. NP Lawrimore noted Plaintiff "would simply spend the day in bed and not eat or take her medication," which led to problems with diabetes control. *Id.*

On December 4, 2015, Plaintiff continued to report moderate levels of anger and depression. Tr. at 1397. She indicated her husband had been "much more caring and vigilant about her getting well," after being lectured by her brother and her doctor. *Id.* She stated her daughter had informed her that she had planned to bring her to Georgia to babysit her grandchild, and she had decided not to move because she needed to take care of herself. *Id.* Plaintiff explored her anger with her daughter. *Id.* Counselor Fulcher encouraged Plaintiff to take better care of herself, as her failure to eat regularly had led to greater instability with her diabetes. *Id.*

Plaintiff presented to Dr. Modi for psychiatric medication management on December 8, 2015. Tr. at 1344. She complained of problems with her daughter, who was living with her boyfriend and teaching her one-year-old grandchild to use profane words. *Id.* She reported difficulty obtaining Abilify, and Dr. Modi offered to switch her to long-acting, injectable Abilify. *Id.* Dr. Modi recorded normal findings on MSE. Tr. at 1344–45. He wrote:

> [Patient] has chronic visual and auditory hallucinations. She has underlying depression. She also feels paranoid about people surrounding her. [S]he was prescribed [A]bilify 2 mg [by mouth once a day] and now unable to get as it is going to be generic. She requested to prescribe [A]bilify [intramuscular]. [W]e have discussed about effects, [side effects] and indication. [W]e will start [A]bilify 400 mg [intramuscular once a] month.

Tr. at 1347.

Counselor Fulcher noted Plaintiff's mood was dysphoric and her functional status was impaired on December 11, 2015. Tr. at 1399. Plaintiff reported having visited the hospital twice since her last session and complained that her husband was providing poor care and failing to help her with her medication. *Id.* She indicated her brother planned to move her into his home, but she was reluctant to leave her possessions. *Id.* Counselor Fulcher encouraged Plaintiff to develop a plan to have her possessions moved to her brother's house. *Id.*

On December 18, 2015, Counselor Fulcher described Plaintiff's mood as a little irritable and her functional status as variably impaired. Tr. at 1401. Plaintiff reported having moved in with a sister, who had recently undergone foot surgery. *Id.* She indicated she was frustrated with her sister's failure to take care of herself, but admitted the living situation was much better than remaining with her husband. *Id.* Counselor Fulcher advised Plaintiff to avoid adding additional stressors to her life. *Id.*

On January 8, 2016, Counselor Fulcher noted that Plaintiff continued to struggle with anger, but was no longer having episodes of uncontrolled rage. Tr. at 1405. She observed Plaintiff to have irritable mood and variably impaired functional status. *Id.* Plaintiff reported having returned to her husband's house because her sister had failed to pay her utility bills, and her electricity and water were scheduled to be disconnected. *Id.* Counselor

Fulcher encouraged Plaintiff to move in with her brother, who had offered her a place to stay, but Plaintiff was reluctant to do so because her brother's children annoyed her. *Id.*

Plaintiff received an Abilify Maintena intramuscular injection on January 11, 2016. Tr. at 1343.

On January 29, 2016, Counselor Fulcher noted Plaintiff's mood was a little dysphoric and her functional status was variably impaired. Tr. at 1407. Plaintiff reported that the sister with whom she had previously lived was now living with her and her husband. *Id.* She stated her sister and her husband were helping to monitor her blood sugar. *Id.* However, she said sister was annoying her, as she would follow her throughout the house. *Id.* Counselor Fulcher encouraged Plaintiff to set boundaries with her sister for privacy. *Id.*

On February 5, 2016, Counselor Fulcher indicated Plaintiff continued to have impaired functional status. Tr. at 1409. Plaintiff reported feeling well, as she had recently taken her medication. *Id.* She stated she was getting better at ignoring compulsions to clean and wash clothes, but continued to clean her bathroom three times a day to compensate for her husband's carelessness. *Id.*

Plaintiff followed up with Dr. Modi on February 9, 2016. Tr. at 1339. Dr. Modi noted no significant changes on MSE. *Id.* He refilled Effexor XR and

Hydroxyzine and administered an Abilify Maintena intramuscular injection. Tr. at 1342.

On February 23, 2016, Plaintiff followed up with Dr. Modi for psychiatric medication management. Tr. at 1330. She reported general stability on her medications, aside from an incident when she "flipped out on her husband." *Id.* She endorsed memory problems and indicated she forgot to turn off the stove when cooking. *Id.* She indicated her mood had improved and she was trying to avoid conflicts. *Id.* Dr. Modi noted no significant changes as to Plaintiff's mental status. *Id.* He continued Plaintiff's medications. Tr. at 1333.

On February 26, 2016, Counselor Fulcher noted Plaintiff's mood was a little dysphoric and her functional status was impaired. Tr. at 1411. Plaintiff complained of feeling more tired and fighting the flu. *Id.*

Plaintiff followed up for Abilify Maintena injections on March 9, April 8, May 6, and June 7, 2016. Tr. at 1309, 1315, 1322, 1323.

On March 18, 2016, Counselor Fulcher described Plaintiff's functional status as impaired. Tr. at 1413. Plaintiff reported increased stress because her children and grandchildren had recently visited her. *Id.* However, she indicated her family members had remarked positively on the decrease in her obsessive cleaning behaviors. *Id.*

On April 1, 2016, Counselor Fulcher described Plaintiff as being a little irritable and having impaired functional status. Tr. at 1415. Plaintiff's scores on the DSM-5 screening tools placed her in the moderate range for anger and the mild range for depression. *Id.* She complained of increased frustration with her husband, who had resumed some of his prior behaviors that angered her. *Id.* Counselor Fulcher encouraged Plaintiff in her plan to seek another apartment for her and her sister. *Id.*

Counselor Fulcher described Plaintiff as having a dysphoric mood, impaired functional status, and a "[l]ittle [s]leepy" affect on April 29, 2016. Tr. at 1419. Plaintiff reported feeling more depressed, as her dog had died unexpectedly, and she had suffered a recent seizure. *Id.*

On May 13, 2016, Plaintiff's mood was anxious and her functional status was impaired. Tr. at 1421. She stated her doctors had admonished her for failing to decrease her weight and stabilize her diabetes. *Id.* Counselor Fulcher provided positive feedback and encouraged Plaintiff to engage in healthy behavior. *Id.*

Plaintiff followed up with Dr. Modi for psychiatric medication management on June 20, 2016. Tr. at 1304. She reported living with her sister and her husband. *Id.* She complained of feeling anxious, sleeping only three to four hours during the night, and sleeping again from 7:00 AM to 7:00 PM. *Id.* She noted her husband had complained of her anger outbursts, which

she estimated occurred four times a week when he tried to wake her during the day. *Id.* She denied depression, hallucinations, suicidal and homicidal ideations, paranoia, other behavioral outbursts, and decreased energy, concentration, and motivation. *Id.* Dr. Modi recorded normal findings on MSE. Tr. at 1304–05. He continued Effexor XR 150 mg, Hydroxyzine, and monthly Abilify Maintena injections. Tr. at 1308. He counseled Plaintiff about sleep hygiene, caffeine intake, and relationship issues and encouraged her to change her sleeping habits and engage in daytime activities. *Id.*

On June 24, 2016, Counselor Fulcher described Plaintiff as having dysphoric mood and impaired functional status. Tr. at 1423. Plaintiff complained that a new diabetes medication had caused her to feel more sedated. *Id.* She reported her mood had declined because she had developed recent numbness in her fingertips and toes and had spent money to visit her daughter that she had planned to use to finance her move. *Id.* Counselor Fulcher encouraged Plaintiff to contact her doctor about the medication and to continue to save money for a move. *Id.*

Plaintiff followed up for Abilify Maintena injections on July 7 and August 2, 2016. Tr. at 1302, 1303.

On August 8, 2016, Plaintiff complained of always feeling anxious. Tr. at 1296. She indicated her depressive thoughts remained stable. *Id.* She denied thoughts of death and suicide, but reported a recent dream about

18

hurting her sister. *Id.* Nurse practitioner Deana McHugh ("NP McHugh"), observed Plaintiff to have appropriate mood and affect and to be oriented to time, place, person, and situation. Tr. at 1299.

On August 15, 2016, Counselor Fulcher described Plaintiff's mood as dysphoric and a little irritable and her functional status as impaired. Tr. at 1425. Plaintiff reported anger toward the sister who lived with her for her failures to take her psychotropic medications and manage her diabetes, as required for her to obtain a needed foot surgery. *Id.* She stated she was getting along better with her husband since his son had moved in with them. *Id.* She indicated she had to attend a funeral later in the week and felt "trapped" in crowds. *Id.* Counselor Fulcher worked with Plaintiff on a strategy to attend the funeral and encouraged her to be honest with others about her feelings. *Id.*

Plaintiff received Abilify Maintena injections on September 2 and 30 and October 27, 2016. Tr. at 1286, 1287, 1294.

Counselor Fulcher described Plaintiff's mood as dysphoric on September 30, 2016. Tr. at 1427. Plaintiff reported she had initially felt as if she were going to have a panic attack upon entering a grocery store, but had remained in the store and found it easier to be there after some time had passed. *Id.* Counselor Fulcher encouraged Plaintiff to continue to visit the grocery store and to use the strategies they had worked on until the

experience stopped being stressful to her. *Id.* Plaintiff expressed frustration with her inability to control her diabetes and aggravation with her sister who lived with her. *Id.* Counselor Fulcher encouraged Plaintiff to eat more vegetables and to use strategies to decrease agitation and stabilize her mood. Tr. at 1428.

On October 14, 2016, Counselor Fulcher described Plaintiff's mood as irritable and a little dysphoric and her functional status as impaired. Tr. at 1429. Plaintiff reported that her stepson's girlfriend had recently engaged in an altercation with another woman while both were in her house and that her sister who lived with her had informed others about it, including her sister Louise. *Id.* She stated she had decided that her sister who lived with her needed to move because she was "stir[ring] up drama." *Id.* Counselor Fulcher encouraged Plaintiff to take measures to decrease her stressors, including getting her sister out of her home. Tr. at 1430.

Plaintiff completed a function report on November 7, 2016. Tr. at 255–62. She reported sleeping more than she had in the past. Tr. at 256. She denied problems with personal care and requiring reminders to take care of her personal needs. Tr. at 256–57. She noted others had to ask her if she took her medicine each day. Tr. at 257. She stated she was able to prepare sandwiches and microwave frozen dinners, but had to stop cooking because she was passing out. *Id.* She indicated she did laundry, but was only able to

do so for an hour or two prior to falling asleep. *Id.* She denied driving. Tr. at 258. She reported shopping for groceries once a month for an hour and a half. *Id.* She endorsed abilities to pay bills, count change, handle a savings account, and use a checkbook/money orders. *Id.* She stated her hobbies included watching television, reading, and coloring, but indicated she did not often engage in those activities because she was often asleep. Tr. at 259. She denied spending time with others and going places on a regular basis. *Id.* She indicated she needed someone to accompany her when she went out and felt nervous in crowds. Tr. at 259–60. She denied having problems getting along with family, friends, neighbors, or others. Tr. at 260. She responded "[d]on't know" in response to questions as to how long she could pay attention and how well she followed written and spoken instructions. *Id.* She said she finished things she started. *Id.* She indicated she got along well with authority figures. Tr. at 261. She denied being fired or laid off from a job due to problems getting along with others. *Id.* She said she handled changes in routine "ok." *Id.* She stated she feared crowds. *Id.*

Plaintiff followed up with Dr. Modi as to schizoaffective disorder on November 8, 2016. Tr. at 1283. She reported feeling better on her medication and being better able to control her anger and irritability. *Id.* She indicated she had been involved in a confrontation with her sister, who lived next to her, but was trying to avoid further confrontation. *Id.* She reported living

with her ex-husband and another sister and having good relationships with them. *Id.* She denied side effects from medications, suicidal and homicidal ideations, paranoia, and hallucinations. *Id.* Dr. Modi recorded normal findings on an MSE. Tr. at 1284. He assessed schizoaffective disorder, depressed type, and refilled Hydroxyzine HCL 25 mg, Effexor XR 150 mg, and Abilify Maintena injections. *Id.*

On November 11, 2016, Counselor Fulcher recorded normal observations on exam. Tr. at 1431. Plaintiff reported a recent altercation with her sister who lived next door. *Id.* She indicated she responded verbally, but not physically. *Id.* Counselor Fulcher commended Plaintiff for disengaging from the situation prior to losing control. *Id.*

On December 12, 2016, Counselor Fulcher indicated Plaintiff had impaired functional status. Tr. at 1433. Plaintiff reported being angered by her family members several times over the prior weeks. *Id.* She admitted she had "g[iven] them a piece of [her] mind," but denied having lost control of her anger. *Id.* She reported her psychiatrist had recently diagnosed her with schizophrenia and prescribed Zyprexa, as she had "seen people and heard things that [were] not there for a long time." *Id.* Counselor Fulcher remarked that Plaintiff had not previously shared this information with her. *Id.* She encouraged Plaintiff to practice coping strategies until the medication reached a therapeutic range. *Id.*

Plaintiff received Abilify Maintena injections on December 22, 2016, and January 23, 2017. Tr. at 1473, 1479.

On January 20, 2017, Counselor Fulcher described Plaintiff as oriented and alert with appropriate affect, euthymic mood, and interactive interpersonal skills, but noted impaired functional status. Tr. at 1747. Plaintiff endorsed stable mood, but noted she had been seeing people and hearing things. *Id.* Counselor Fulcher advised Plaintiff of ways to address her hallucinations and encouraged her to contact her psychiatrist. *Id.*

Counselor Fulcher again described Plaintiff's functional status as impaired on February 3, 2017. Tr. at 1749. Plaintiff reported continued hallucinations, but stated they did not scare her as they had previously. *Id.* She discussed an incident in which she had become angry with her stepson's girlfriend. *Id.* She admitted to having "told the woman off," but denied having lost control. *Id.*

On February 7, 2017, Plaintiff endorsed stable mood and denied hallucinations, aside from seeing occasional shadows of dead relatives. Tr. at 1470. Dr. Modi recorded normal findings on MSE. Tr. at 1471. He refilled Plaintiff's prescriptions and continued her monthly injections. *Id.*

Plaintiff presented to Dr. DePace for a second consultative MSE on February 16, 2017. Tr. at 1435. She reported living with her sister and being estranged from her husband. *Id.* She said she graduated from high school,

23

after having been enrolled in classes for learning disabilities in math and English during eleventh and twelfth grades. *Id.* She stated her medication made her sleepy and prevented her from working. *Id.* Plaintiff reported she woke at 7:00 AM on a typical day, took her diabetes medication, and went back to sleep until 2:00 PM, when she ate and took more medication. *Id.* She estimated that she slept for 10 to 12 hours per day, only staying up for an hour or two at a time. *Id.* She said she watched television and did household chores when she was awake. *Id.* She endorsed memory difficulties and denied driving due to a seizure three months prior. *Id.* She indicated she managed her own funds. *Id.* Plaintiff reported seeing a counselor every other week and a psychiatrist every three months. *Id.*

Dr. DePace observed Plaintiff to be casually dressed and appropriately groomed, alert and oriented in all spheres, and aware of current events. Tr. at 1436. He stated Plaintiff walked slowly and had slow speech, but normal psychomotor behaviors. *Id.* He noted she demonstrated a constricted range of affect, goal-directed and coherent thought processes, and appeared to be functioning in at least the low-average range of intellectual ability. *Id.* Plaintiff reported seeing deceased family members "every other day." *Id.* She stated her medication was effectively suppressing thoughts of harming herself or others. *Id.* She denied paranoia. *Id.* Dr. DePace noted Plaintiff was cooperative, but maintained extremely limited eye contact and often

responded to questions with her eyes closed. *Id.* He stated Plaintiff was able to follow directions without significant difficulties and to clearly state her perspective on questions asked of her. *Id.* He indicated Plaintiff "seemed tired," but showed no significant tearfulness, fearfulness, anxiety, sadness, or anger. *Id.* He noted Plaintiff had asked whether the Division of Disability Determinations thought "that people fake their illnesses." Tr. at 1437. His diagnostic impressions were unspecified depressive disorder, medical and physical issues, and no evidence of schizophrenia. *Id.* Dr. DePace wrote:

> Cognitively, the claimant has the cognitive ability to perform all higher-order activities of daily living and all three-step commands if she believes herself to be physically able to do so; [s]he does not appear to have had any changes in [her] cognitive abilities since [s]he was last employed. Interpersonally, she appears to have the ability to properly and effectively interact with others, if she chooses to do so. The claimant has the cognitive ability to manage her own funds and denies other problematic factors that could compromise her ability to effectively manage any money that she has in her possession. Finally, there was no significant evidence obtained during this evaluation that suggested that the claimant was attempting to fabricate problems or exaggerate existing ones.

*Id.*

Plaintiff received Abilify Maintena injections on February 23 and March 21, 2017. Tr. at 1463, 1465.

On March 21, 2017, state agency psychological consultant Michael Neboschick, Ph.D. ("Dr. Neboschick"), reviewed the record and considered listing 12.04 for depressive, bipolar, and related disorders. Tr. at 62–63, 74–

75. He assessed Plaintiff's mental impairment as non-severe, noting mild difficulties in her abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.*

On April 20, 2017, Plaintiff endorsed stable mood and denied being easily angered and irritated. Tr. at 1452. She reported poor appetite, sleeping during the day, and watching television during the night. *Id.* She described seeing occasional shadows out of the corners of her eyes, but denied active hallucinations. *Id.* Dr. Modi recorded normal findings on MSE. *Id.* He refilled Plaintiff's prescriptions and continued her injections. Tr. at 1453.

Plaintiff received Abilify Maintena injections on May 19 and June 20, 2017. Tr. at 1441, 1447.

On June 1, 2017, Counselor Fulcher noted Plaintiff had appropriate affect, euthymic mood, and interactive interpersonal skills, but was functioning "[a] [l]ittle [s]low cognitively and had impaired functional status. Tr. at 1751. Plaintiff reported that Dr. Modi had told her she needed help with her anger and sleep. *Id.* She stated she had been feeling angrier lately, which tended to increase her blood pressure. *Id.* She noted her stepson and his girlfriend were irritating her by leaving dirty clothes and dishes around the house. *Id.* She indicated she was awake at night and sleeping during the day to avoid the other members of her household. *Id.* Counselor Fulcher

worked with Plaintiff on strategies for addressing her frustration and encouraged her to set an alarm so that she did not sleep for too long during the day. *Id.* She noted some regression in Plaintiff's progress. Tr. at 1752.

On July 20, 2017, Plaintiff reported having traveled to Georgia to assist her daughter, who had recently separated from her boyfriend. Tr. at 1488. She mentioned thoughts of "set[ting the daugher's boyfriend] on fire," but said she had "no plan to hurt anyone." *Id.* Dr. Modi observed Plaintiff to have irritable mood, but otherwise normal mental status. Tr. at 1490. He continued Plaintiff's medications and ordered his nurse to administer Plaintiff's monthly Abilify Maintena injection. *Id.*

Plaintiff also followed up with Counselor Fulcher on July 20, 2017. Tr. at 1753. Counselor Fulcher noted normal MSE findings, but impaired functional status. *Id.* Plaintiff reported fewer stressors in her home, as her husband had made her stepson and his girlfriend move. *Id.* She endorsed aggressive thoughts toward others when she was angry and aggravation with her husband and sister, but stated she was able to control her thoughts and did not intend to harm anyone. *Id.*

On July 28, 2017, a second state agency psychological consultant, Jennifer Steadham, Ph.D. ("Dr. Steadham"), reviewed the record and considered Listing 12.03 for schizophrenia spectrum and other psychotic disorders, as well as Listing 12.04. Tr. at 91–92, 106–07. She rated Plaintiff

as having mild difficulties in her abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.*

Counselor Fulcher described Plaintiff's mood as dysphoric, her affect as blunted, and her functional status as impaired on August 3, 2017. Tr. at 1755. Plaintiff reported having been hospitalized for kidney failure and expressed frustration over being ill, despite being compliant with her diet and medications. *Id.* She indicated her husband had been supportive. *Id.*

On August 17, 2017, Nurse Practitioner Deana Freeman ("NP Freeman"), administered a depression screening that showed Plaintiff to have moderately-severe depression. Tr. at 1732. She noted Plaintiff was pleasant and cooperative during the exam, had good judgment and insight, but demonstrated a flat affect and rarely made eye contact. Tr. at 1733. Plaintiff received an Abilify Maintena injection. Tr. at 1736.

Counselor Fulcher described Plaintiff's mood as dysphoric and anxious, her affect as flat, and her functional status as impaired on August 18, 2017. Tr. at 1757. Plaintiff reported having experienced a seizure on the prior day and indicated she was tired and scared of dying. *Id.* She complained of frustration that her blood sugar was again fluctuating to high levels. *Id.* Counselor Fulcher encouraged Plaintiff to continue to follow her doctors' orders. *Id.*

Plaintiff received an Abilify Maintena injection on September 20, 2017. Tr. at 1727.

On October 12, 2017, Counselor Fulcher noted Plaintiff was managing her anger much better since being on medication that addressed auditory hallucinations. Tr. at 1759. She indicated Plaintiff continued to have difficulty dealing with her health problems and a sister who aggravated her. *Id.*

On October 19, 2017, Plaintiff reported doing well overall, but complained that she was experiencing visual hallucinations of her dead mother immediately prior to her monthly Abilify Maintena injections. Tr. at 1565. Dr. Modi noted normal findings on MSE. Tr. at 1725. He refilled Plaintiff's medications and continued her injections. *Id.* He instructed Plaintiff to take Abilify 5 mg for three to four days prior to her next injection to address visual hallucinations and to follow up for injections every 26 days. Tr. at 1726. The nurse administered an Abilify Maintena injection. *Id.*

Plaintiff reported symptoms consistent with moderately-severe depression on November 3, 2017. Tr. at 1557. NP Freeman noted Plaintiff was alert and oriented, had good judgment and insight, and demonstrated flat affect with poor eye contact. Tr. at 1558. She indicated Plaintiff should continue to see Dr. Modi for schizoaffective disorder. Tr. at 1559.

Plaintiff received Abilify Maintena injections on November 14 and December 18, 2017. Tr. at 1547, 1553.

On December 19, 2017, Plaintiff reported stable mood most of the time, but indicated her hallucinations tended to increase a week prior to her next Abilify Maintena injection. Tr. at 1542. She endorsed increased stressors related to the holiday season, but reported feeling more active and having more energy. *Id.* She denied command hallucinations. *Id.* Dr. Modi recorded normal findings on MSE. Tr. at 1544. He continued Plaintiff's medications. Tr. at 1344, 1345.

Counselor Fulcher noted normal MSE findings, aside from impaired functional status on December 21, 2017. Tr. at 1761. Plaintiff reported feeling better physically, after having lost 100 pounds. *Id.* She indicated her psychiatrist had prescribed medication to help with "her nerves," as she anticipated increased anxiety due to her family visiting for the holidays. *Id.* She continued to endorse fearful thoughts when visiting the grocery store. *Id.* Counselor Fulcher encouraged Plaintiff to use the techniques they had worked on to assess threat and replace fearful thoughts with more positive thoughts. *Id.*

On January 2, 2018, NP Freeman noted Plaintiff rarely made eye contact and did not answer questions easily. Tr. at 1532. She stated Plaintiff

seemed uninterested in her health care, as she had to pull information from her. *Id.*

Plaintiff received Abilify Maintena injections on January 18 and February 20, 2018. Tr. at 1526, 1719.

On March 19, 2018, Plaintiff reported feeling better and denial visual hallucinations. Tr. at 1710. She endorsed increased anxiety when attempting to drive. *Id.* Dr. Modi observed Plaintiff to walk slowly and appear to be in pain, but noted normal findings on MSE. Tr. at 1712–13. He refilled Plaintiff's medications, instructed her to taper down her dose of Effexor XR over the next two weeks, and prescribed Cymbalta 30 mg at bedtime for two weeks and then twice a day. Tr. at 1713. He assessed unspecified schizophrenia and generalized anxiety disorder ("GAD") and referred Plaintiff to a psychologist for cognitive behavioral therapy for anxiety. *Id.* The nurse administered an Abilify Maintena injection. *Id.*

Plaintiff presented to psychologist Farrah M. Hughes, Ph.D. ("Dr. Hughes"), to establish care and treatment for anxiety/panic and schizophrenia on March 27, 2018. Tr. at 1705. Dr. Hughes administered several screening tools, including a posttraumatic stress disorder ("PTSD") screening that was negative, a depression screening that indicated mild depression, and an anxiety screening that showed severe anxiety. *Id.* Plaintiff reported she continued to grieve her mother's death a decade earlier and was

afraid to enter a store by herself. *Id.* She endorsed well-managed psychiatric symptoms, aside from anxiety. *Id.* She denied suicidal and homicidal thoughts, delusions, difficulty sleeping, loss of appetite, eating disorder, and substance abuse. Tr. at 1707. She reported hallucinations that were controlled with medication, financial stressors, severe anxiety, and mild depression. *Id.* Dr. Hughes worked with Plaintiff to develop a plan to address stressors, increase coping skills, and prevent relapse. *Id.* She indicated she would work with Plaintiff to develop a behavioral plan to advance her goal of being able to enter a store by herself. *Id.*

Plaintiff returned to Dr. Hughes for psychotherapy on April 3, 2018. Tr. at 1701. She described an incident in which she had been shopping with her sister and a friend, the friend returned to the car to retrieve his wallet, and scared her so much when he returned that she had to sit in the car for an hour to calm down prior to resuming her shopping. *Id.* She indicated she felt that her anhedonia had negatively affected her marriage, as she no longer engaged in the fun activities that she had previously engaged in with her husband. *Id.* She endorsed severe anxiety, mild depression, stressors, and hallucinations that were managed with medication. Tr. at 1702. She indicated she was unable to enter a store alone. *Id.* She denied suicidal and homicidal thoughts, delusions, difficulty sleeping, loss of appetite, and substance abuse. *Id.* Dr. Hughes noted normal findings on MSE, aside from

psychomotor retardation. *Id.* She developed a plan with Plaintiff to address stressors, increase coping skills, and prevent relapse and provided information on exposure therapy to address anxiety. Tr. at 1703.

Plaintiff received an Abilify Maintena injection on April 19, 2018. Tr. at 1693.

On May 17, 2018, Plaintiff reported doing "okay," but indicated she had panicked when a man approached her for help locating an item while she was attempting to shop by herself. Tr. at 1681. She indicated she left the store without her groceries. *Id.* Plaintiff denied suicidal and homicidal thoughts and endorsed severe anxiety, mild depression, sleeping too much, and visual hallucinations that were managed with medication. Tr. at 1683. Dr. Hughes noted normal findings on MSE, aside from constricted affect and psychomotor retardation. *Id.* She assessed schizophrenia, GAD, and panic attacks. *Id.* She worked with Plaintiff to develop plans to address stressors, increase coping skills, and gradually expose herself to anxiety-provoking settings. *Id.* She recommended couple therapy to improve Plaintiff's relationship with her husband. *Id.*

Plaintiff received Abilify Maintena injections on May 17 and June 14, 2018. Tr. at 1669, 1686.

Plaintiff reported minimal depression on July 10, 2018. Tr. at 1656. She stated she had visited the store alone and purchased "a cart full" of groceries without incident. *Id.* Dr. Hughes noted normal findings on MSE. *Id.*

Plaintiff received Abilify Maintena injections on July 12 and August 9, 2018. Tr. at 1641, 1652.

On August 16, 2018, Plaintiff reported thoughts of harming her husband, as he had been cheating on her. Tr. at 1632. She denied paranoia and hearing voices. *Id.* Dr. Modi noted Plaintiff was walking slowly and appeared to be in pain, but recorded normal MSE findings. Tr. at 1634–35.

On August 28, 2018, Plaintiff reported shopping on her own and indicated she was striving for greater independence and hoped to begin driving again soon. Tr. at 1628. She was frustrated, hurt, and disappointed by her husband's unfaithfulness. Tr. at 1628–29. Dr. Hughes noted Plaintiff had a constricted and flat affect and psychomotor retardation. Tr. at 1629. She worked with Plaintiff to develop effective coping skills and problem-solving strategies. Tr. at 1629–30.

Plaintiff received an Abilify Maintena injection on September 7, 2018. Tr. at 1622.

Plaintiff returned to Dr. Hughes for psychotherapy on September 12, 2018. Tr. at 1616. Dr. Hughes stated increased motivation to become

independent was helping Plaintiff to conquer her fears. *Id.* She noted psychomotor retardation, but otherwise normal findings on MSE. Tr. at 1617.

Plaintiff received Abilify Maintena injections on October 9 and November 12, 2018. Tr. at 1578, 1599.

On November 15, 2018, Plaintiff reported doing well overall. Tr. at 1571. She endorsed some auditory hallucinations on the two to three days prior to her Abilify Maintena injections, but noted they improved with use of oral Abilify on those days. *Id.* She reported good appetite and sleeping well, but noted her sister had informed her that she was sleepwalking. *Id.* Dr. Modi observed that Plaintiff appeared to be in pain, but otherwise noted normal findings on MSE. Tr. at 1573. He assessed schizophrenia and GAD and continued Plaintiff's medications. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

Plaintiff testified that she lived in a mobile home with her sister. Tr. at 53. She stated she was 5'2" tall, weighed 228 pounds, and was right-handed. Tr. at 1795. She said she had attended technical college for six months, but had failed to obtain a welding certification. *Id.* She denied having repeated any grades, but indicated she had been in special education classes in the ninth and tenth grades. Tr. at 1796. She said she had driver's license with no

restrictions. *Id.* She stated her husband had driven her to the hearing, which was approximately 15 minutes from her home. *Id.* In response to the ALJ's question as to how often she left her home during an average week, Plaintiff stated she really didn't go anywhere. *Id.* She said she left her house to go to the grocery store for about 30 minutes once a month. Tr. at 1796–97. She indicated she typically pushed a shopping cart in the grocery store. Tr. at 1797. She stated she was able to dress without assistance. *Id.* She noted her sister would remain in the bathroom while she bathed, given her history of seizures. *Id.* She denied preparing meals, washing clothes, washing dishes, making her bed, performing other household chores, and doing yardwork. Tr. at 1797–98. She said she spent an average of 30 minutes per day using the internet. Tr. at 1798. She denied walking and engaging in outdoor activities for exercise due to her arthritis. Tr. at 1799. She stated her sister took care of her bills. *Id.*

Plaintiff estimated that she could sit for 20 minutes prior to developing swelling or increased pain. *Id.* She said she could walk for 30 minutes and stand for 20 minutes prior to feeling increased pain and needing to lie down. *Id.* She stated she could lift about 20 pounds. *Id.* She indicated her abilities to sit, stand, and walk had worsened since December 31, 2017. *Id.*

Plaintiff testified she last worked as a graphic designer, designing ads for Media General Operations, where she worked from 2002 to 2012. Tr. at

1800. She stated she was fired from the position. Tr. at 1801. She said she looked for other work, but was unable to find anything. *Id.* She indicated she had last applied for work as a cashier at Wal-Mart in 2017. *Id.*

Plaintiff testified that she received primary care treatment from NP Freeman and psychiatric treatment from Dr. Modi, both at Hope Health. Tr. at 1802. She confirmed that she had previously attended counseling at WellSpring. *Id.* She indicated she was being treated for arthritis in her feet, legs, arms, and hands, as well as diabetes and high blood pressure. Tr. at 1803. She stated she took Gabapentin for pain and that it had been increased from 300 mg to 800 mg per dose. Tr. at 1803–04. She said she was an insulin-dependent diabetic. Tr. at 1804. She denied problems related to diabetes and indicated her blood sugar was generally within the correct range if she took her insulin and ate properly. Tr. at 1805. She said she had been diagnosed with diabetes more than 20 years prior. Tr. at 1813. She stated Dr. Freeman was providing medication for seizure control, but she continued to experience seizures once or twice a month. Tr. at 1805–06. She said she had problems with kidney function and was seeing a kidney specialist. Tr. at 1806. She stated she had been experiencing daily headaches, but she no longer had them. Tr. at 1807, 1813. She denied taking specific medication for headaches. Tr. at 1807.

Plaintiff testified that she had been hospitalized for depression in 2015. Tr. at 1807. She indicated she had received treatment at WellSpring until she switched to Hope Health for treatment. Tr. at 1808. She stated she had received regular psychiatric treatment from WellSpring and Dr. Modi and was seeing a counselor. *Id.* She said she had problems with hallucinations and was being treated with medication for schizophrenia and depression. *Id.* She testified that she took medication for these impairments twice each day that made her feel tired and sleepy. Tr. at 1809. She said she slept all day. *Id.*

Plaintiff testified she had received chiropractic treatment for her shoulders, neck, and back. Tr. at 1810. She said her medication affected her ability to function and prevented her from driving. Tr. at 1811. She indicated she slept well at night because her medicine kept her sleepy. *Id.* She stated it was more difficult for her to remain awake. *Id.*

Plaintiff stated her doctor provided injections and had increased her medication from once to twice a day to address her reports of hallucinations. Tr. at 1811–12. She said her doctor had adjusted her medication four months prior and admitted the medication change helped with the hallucinations. Tr. at 1812. She clarified that she had experienced hallucinations less frequently since her doctor increased her medication. *Id.* She stated the hallucinations occurred about once a week following the medication change, but had occurred daily prior to the change. Tr. at 1813.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Laura McDowell reviewed the record and testified at the hearing. Tr. at 1813–16. The VE categorized Plaintiff's PRW as a graphic designer, *Dictionary of Occupational Titles* ("*DOT*") number 141.061-018, as requiring sedentary exertion and having a specific vocational preparation ("SVP") of 7. Tr. at 1814. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the sedentary exertional level; occasionally balance, stoop, kneel, and climb ramps and stairs; never crouch, crawl, or climb ladders, ropes, or scaffolds; and never work at unprotected heights or with unprotected, dangerous, moving mechanical parts. Tr. at 1814–15. The VE testified that the hypothetical individual would be able to perform Plaintiff's PRW. Tr. at 1815.

The ALJ asked the VE to provide an opinion as to how many days per month an employee could be absent from work on a regular basis in a competitive work setting. *Id.* The VE stated an employee could be absent no more than one day per month on a regular basis. *Id.* The ALJ asked the VE what percentage of the workday an employee could be off task on a regular basis. *Id.* The VE testified the individual could be off task no more than 10 percent of the time. *Id.* The ALJ asked the VE to clarify the basis of her opinion regarding absences and time off task. *Id.* The VE stated her response was based on her education and experience. Tr. at 1816.

Plaintiff's counsel asked the VE to consider the individual described in the ALJ's hypothetical question, but to further assume the individual would be restricted to unskilled work due to a diagnosed mental condition. *Id.* He asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE responded that she would not. *Id.*

### 2. The ALJ's Findings

In her decision dated March 14, 2019, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
2.  The claimant has not engaged in substantial gainful activity since September 27, 2016, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.  The claimant has the following severe impairments: arthropathies and osteoarthritis, diabetes mellitus, obesity, and history of seizures and headaches (20 CFR 404.1520(c) and 416.920(c)).
4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except for the following limitations. The claimant can occasionally climb ramps or stairs and never climb ladders, ropes or scaffolds. The claimant can occasionally balance, stoop, and kneel. The claimant can never crouch or crawl. The claimant should never work at unprotected heights or around dangerous moving mechanical parts.
6.  The claimant is capable of performing past relevant work as a graphic designer. This work does not require the performance of

work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from September 27, 2016, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 13–19.

## II.    Discussion

Plaintiff alleges the Commissioner erred in failing to consider her mental impairments as severe at step two and in failing to accommodate her mental restrictions in assessing her RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

### A.    Legal Framework

#### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[8] (4) whether such impairment prevents claimant from performing PRW;[9] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are

---

[8] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[9] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that

she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

            2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

Plaintiff argues the ALJ erred in failing to consider her mental impairments as severe at step two and in assessing her RFC. [ECF No. 21 at 4–15]. She maintains the record shows she was hospitalized for psychiatric treatment in July 2015, diagnosed with MDD and schizoaffective disorder, received monthly psychiatric treatment, and had functional limitations related to her mental impairments. *Id.* at 5–15; ECF No. 26 at 2.

The Commissioner argues the ALJ did not err at step two because she assessed physical impairments as severe and proceeded to subsequent steps in the evaluation process. [ECF No. 20 at 6–7]. He maintains that the record did not support additional limitations in the RFC assessment based on mental impairments. *Id.* at 7. He contends Plaintiff's medications controlled her psychiatric symptoms. *Id.* at 7–8. He claims that substantial evidence supports the ALJ's finding that Plaintiff could perform her PRW as a graphic designer. *Id.* at 9–10.

A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, and work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)." SSR 85-28. Basic mental work activities include: understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a work setting. *See* 20 C.F.R. §§ 404.1522(b), 416.922(b).

In discussing her assessment of severe impairments at step two, the ALJ wrote:

> The claimant has a history of mental symptoms, including depression (Exhibits B3F; B4F; B8F). She has required psychiatric hospitalization, though this is before her amended alleged onset date (Exhibit B3F/6).
>
> She underwent independent psychological consultative examination on February 16, 2017 (Exhibit B9F). The claimant alleged ongoing sleepiness and need to be in bed. She also reported ongoing hallucinations. She was noted to have multiple medications with her. She had slow rate of speech and soft

volume. Her affect was restricted. She had extremely limited eye contact and responded to questions with her eyes closed. However, despite this, she was alert and oriented. She was appropriate with the examiner. She was able to follow directions and answer questions clearly. Her intellect was estimated to be around the low average range. The examiner found no notable deficits in cognition or interpersonal ability.

She has been inconsistent about her reports of hallucinations, reporting that she was diagnosed with schizophrenia by her psychiatrist but not informing her psychotherapist of this until late 2016 (Exhibit B8F/67). The claimant has been sustained on fairly conservative mental health treatment as well. She has had ongoing psychotherapy and medication monitoring (Exhibits B8F/61–68; B16F/39; B18F). She has reported good management of moods with consistency to medications and has not exhibited persisting dysphoria, poor orientation, or impaired concentration. She affirmed this at the hearing, testifying that the medications have addressed depression and hallucinations, though she does feel somewhat more tired and sleepy.

The claimant's medically determinable impairment depression does not cause more than minimal limitations in the claimant's ability to perform basic mental work activities and is therefore nonsevere.

Tr. at 13–14.

The ALJ further noted that her assessment of Plaintiff's mental impairments as "nonsevere" was supported because her medically-determinable mental impairments caused "no more than 'mild' limitation in any of the functional areas." Tr. at 15. In reaching her conclusion, she gave no weight to Dr. DePace's examination findings from the period more than three years prior to Plaintiff's amended alleged onset date, great weight to

his updated opinion, and great weight to the state agency psychological consultants' assessments. *Id.*

The ALJ considered the four broad areas of mental functioning and rated Plaintiff's degree of functional limitations in accordance with 20 C.F.R. § 404.1520a and § 416.920a. Tr. at 14. She found Plaintiff to have no limitation in understanding, remembering, or applying information, explaining:

> In her Function Report, she denied any difficulties with memory or cognition (Exhibit 6E). At the hearing, she testified that she is tired and sleepy due to her medications. The claimant was noted to be somewhat slow in speech and tired looking during independent psychological consultative examination (Exhibit B9F). However, she exhibited at worst intellectual functioning estimated to be around the low average range. She was also oriented. This is generally consistent with her mental status on treating visits (Exhibit B11F; B16F; B18F).

*Id.*

The ALJ assessed mild limitation in interacting with others, explaining:

> In her Function Report, she denied any difficulties with social functioning (Exhibit B6E). The claimant has provided conflicting evidence of turbulent interpersonal relationships (Exhibit B1F; B9F). She alleges a toxic relationship with her sister resulting in estrangement from her husband. She has been noted to have restrictions in affect and during her independent psychological consultative examination, had poor eye contact (Exhibit B9F). She has also exhibited the same issues with eye contact and affect to her primary care provider (Exhibit B13F/40). However, she has reported to medical treating providers of living with her husband and even during her independent psychological consultative examination indicated no issues with her sister, who

she lives with as of the evaluation (Exhibit B8F/4; B9F; B12F/11; B18F). On psychotherapy and medication management visits in 2017, she reported mood stability on medications (Exhibit B13F/47 B18F). She was noted generally to have no notable issue with her mood and to be interactive with her therapist.

*Id.*

The ALJ considered Plaintiff to have mild limitation in concentrating, persisting, or maintaining pace, noting:

In her function report, she denied any difficulties with concentration (Exhibit 6E). At the hearing, the claimant testified to ongoing difficulties with motivation, namely that she has to sleep often due to her medications. During her independent psychological consultative examination, she was noted to be slow in speech (Exhibit B9F). However, she was able to attend to the conversation and follow instructions. She has shown intermittent slowness in cognitive functioning but no notable issues with concentration (Exhibits B11F; B18F).

The ALJ found no limitations in the area of adapting or managing oneself, explaining:

In her function report, she denied needing notable assistance for activities of daily living (Exhibit 6E). The claimant has been prone to excessive sleep by her own report (Exhibit B9F). She has reported issues with interacting appropriately with others in addressing conflicts and managing her own care (Exhibits B11F; B18F). She also alleges ongoing hallucinations. However, she was appropriate and able to attend the independent psychological consultative examination (Exhibit B9F). She has exhibited appropriate behavior and demeanor to others, including treating providers.

Tr. at 14–15.

Although Plaintiff's psychiatric providers assessed mental impairments that included MDD, GAD, and schizophrenia/schizoaffective disorder, they

did not indicate specific functional limitations that were caused by Plaintiff's mental impairments. Nevertheless, the record includes Counselor Fulcher's repeated impressions that Plaintiff was functionally impaired. *See*, e.g., Tr. at 1425, 1433, 1749, 1751, 1755, 1761. While Counselor Fulcher did not opine as to specific functional limitations, her treatment notes and those of Plaintiff's other providers suggest Plaintiff had some impairment in her abilities to adjust to public settings, such as a grocery stores, and interact appropriately with others. *See, e.g.*, Tr. at 1283, 1705, 1751, 1761, 1749. The records suggest Plaintiff would have some impaired ability in basic work activities to include responding appropriately to supervision, coworkers, and usual work situations and dealing with changes in a work setting. *See* 20 C.F.R. §§ 404.1522(b), 416.922(b). Given this evidence, the ALJ erred in failing to assess Plaintiff's mental impairments as severe.

The ALJ's failure to assess Plaintiff's mental impairments as severe at step two may be deemed harmless if she considered them in assessing Plaintiff's RFC and determining her ability to perform work. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits exclusively at step two and proceeded to the next step of the evaluation sequence."); *see also Washington v. Astrue*, 98 F. Supp. 2d 562, 580 (D.S.C. 2010) (providing that the court "agrees with other courts

that find no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment at subsequent steps").

A claimant's RFC represents "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ is required to "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine on a function-by-function basis, how they affect [her] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin* 826 F.3d 176, 188 (4th Cir. 2016)). She should consider all the relevant evidence and account for all the claimant's medically-determinable impairments in the RFC assessment. 20 C.F.R. §§ 404.1545(a), 416.945. She must provide a narrative discussion that includes "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. She "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court provided that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or

where other inadequacies in the ALJ's analysis frustrate meaningful review.'" (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

The ALJ included no restrictions in the RFC assessment as to mental functions. *See* Tr. at 16. In fact, she did not address Plaintiff's mental impairments in explaining the RFC assessment. *See* Tr. at 16–18.

The undersigned has reviewed the decision as a whole to determine whether the ALJ provided a sufficient explanation for her decision to include no mental restrictions in the RFC assessment. The ALJ's explanation at step two shows that she did not ignore evidence of Plaintiff's mental impairments. However, despite her lengthy explanation at step two, she failed to adequately consider the entire record in reaching her conclusion that Plaintiff's mental impairments imposed no functional limitations.

While the ALJ correctly noted that Plaintiff denied problems getting along with others in a function report, Tr. at 14, she ignored Plaintiff's representations in the same report that she did not spend time with others, did not go places on a regular basis, needed someone to accompany her when she visited places, and felt nervous in crowds. *See* Tr. at 255–62. The ALJ correctly noted that Plaintiff demonstrated poor eye contact during some treatment visits. *See* Tr. at 1240, 1246, 1436, 1532, 1558, 1733. However, she failed to note that Plaintiff's medical providers sometimes noted her inappropriate facial expressions, including her smiling when speaking of

harming others. *See* Tr. at 1240, 1246. The ALJ's representation that Plaintiff "provided conflicting evidence of turbulent interpersonal relationships," is somewhat misleading, and it seems that the ALJ thought Plaintiff was describing interactions with the same sister when she was actually describing interactions with a least two of her three sisters. Plaintiff reported getting along with her husband when she felt that he was being supportive and with one of her sisters when she was not annoying her or "stir[ring] up drama." Tr. at 1397, 1401, 1425, 1755. However, she endorsed conflict with or being annoyed by her husband and the same sister at other times, as well as with her stepson, the stepson's girlfriend, her brother's children, her daughter, her daughter's boyfriend, and at least one of her other sisters.[10] *See, e.g.*, Tr. at 1391, 1397, 1407, 1415, 1632, 1749, 1751. Plaintiff's anger toward her sister Louise was so great that she reported on several occasions that she wanted to physically harm or kill her. *See* Tr. at 324, 958, 1242, 1246, 1370. She expressed thoughts of harming others during treatment visits, as well. *See* Tr. at 1488, 1632, 1753. Despite being medicated and managing to control her physical aggression, Plaintiff

_____

[10] The undersigned was unable to discern from the record whether Plaintiff's sister Louise was the sister who lived next to her. If she was, it appears that Plaintiff had significant conflict with Louise, occasional conflict with the sister who lived with her, and no conflict with her third sister. If not, it appears that Plaintiff had significant conflict with both Louise and the sister who lived next to her and occasional conflict with the sister who lived with her.

reported "flip[ing] out," giving others a "piece of [her] mind," and engaging in verbal altercations on multiple occasions. *See* Tr. at 1283, 1304, 1330, 1364, 1383, 1431, 1422, 1749.

The ALJ correctly noted that Plaintiff reported mood stability on medications during treatment visits in 2017. *See* Tr. at 14. However, the ALJ did not reconcile that Plaintiff continued to endorse psychiatric symptoms throughout 2017, including visual and auditory hallucinations, thoughts of harming others, verbal altercations with others, sleeping throughout the day to avoid members of her household, and anxiety in public. *See* Tr. at 1488, 1452, 1747, 1749, 1751, 1761.

The ALJ's impression that Plaintiff was "noted generally to have no notable issues with her mood and to be interactive with her therapist," Tr. at 15, is only partially correct. Counselor Fulcher generally described Plaintiff as interactive during visits, but she also frequently observed Plaintiff to demonstrate irritability, anxiety, and dysphoric mood. *See* Tr. at 1370, 1375, 1389, 1391, 1393, 1395, 1399, 1401, 1405, 1407, 1411, 1415, 1419, 1421, 1423, 1425, 1427, 1429, 1755, 1757.

The ALJ neglected to reconcile evidence to the contrary and failed to provide a logical explanation to support her conclusion that Plaintiff had no functional limitation in adapting or managing herself. In *Thomas*, 916 F.3d at 311, the court explained that "a proper RFC analysis has three

components: (1) evidence, (2) logical explanation, and (3) conclusion. Despite having acknowledged evidence that Plaintiff was prone to excessive sleep, reported issues interacting with others in addressing conflicts and managing her own care, and alleged ongoing hallucinations, the ALJ found she had no difficulties adapting or managing herslef. Tr. at 14–15. She noted that Plaintiff had also "exhibited appropriate behavior and demeanor to others, including treating providers," and had "denied needing notable assistance for activities of daily living" in her function report. *Id.* However, such evidence does not negate the evidence of functional impairment. In addition, the ALJ did not address evidence in the same function report that members of Plaintiff's household would make sure that she took her medications and had to accompany her when she left the home. *See* Tr. at 257, 259. She also failed to reconcile other evidence throughout the record that suggested Plaintiff had difficulty managing her psychologically-based symptoms.

At step four, the ALJ concluded that Plaintiff could perform her PRW as a graphic designer. Tr. at 18. The *DOT* describes this job as involving, in part, the following: "Draws sample of finished layout and presents sample to ART DIRECTOR . . . for approval. Prepares notes and instructions for workers who assemble and prepare final layouts for printing. Reviews final layout and suggests improvements as needed. May prepare illustrations or rough sketches of material according to instructions of client or supervisor."

141.061-018, GRAPHIC DESIGNER. *DOT* (4th Ed., Rev. 1991), 1991 WL 647094. In terms of speaking ability required of the job, the *DOT* indicates: "Participate in panel discussions, dramatizations, and debates. Speak extemporaneously on a variety of subjects." *Id.* This job appears to require significant interaction with others and public speaking, which some evidence suggests may present problems for Plaintiff. It is possible that Plaintiff performed her PRW differently than it is described in the *DOT*, such that she could have performed it even if she had some mental functional limitations. However, it is impossible for the court to draw such a conclusion, as Plaintiff's PRW was not explored in detail in her hearing testimony.

As the ALJ's decision does not reflect her consideration of all the relevant evidence as to possible functional limitations imposed by Plaintiff's mental impairments, substantial evidence does not support the RFC assessment and the resulting conclusion that Plaintiff could perform her PRW as a graphic designer.

III.   Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the

undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

April 28, 2021                                   Shiva V. Hodges
Columbia, South Carolina                United States Magistrate Judge